IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TRACEY BROWN-EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:20-cv-876-RAH |
| | ) | [WO] |
| STEVEN T. MARSHALL, | ) | |
| in his official capacity as the | ) | |
| Attorney General of the State of | ) | |
| Alabama, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This discrimination case presents two limitations of Title VII of which employees should be aware.  Title VII offers broad protections against discrimination in the workplace, but it does not prohibit *all* conduct an employee may find offensive or discriminatory, and Title VII claims are not indefinite in duration.  That is, employees cannot seek recourse for trivial harms nor bring claims for discriminatory conduct long after the clock has run out.

Plaintiff Tracey Brown-Edwards, a Black female, brings this action against her former employer, Steven T. Marshall, in his official capacity as the Attorney General of the State of Alabama.  Brown-Edwards claims she was unlawfully discriminated against in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.* (Title VII); and the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d) (EPA).  Discovery now at an end, Marshall has moved for summary judgment on all claims.  With Marshall's motion having been fully briefed and thus ripe for decision, for the reasons more fully set forth below, the motion is due to be granted.

## JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Brown-Edwards's federal causes of action.  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on the materials in the record.  Fed. R. Civ. P. 56(a), (c).  The court must view the evidence and all reasonable inferences drawn therefrom "in the light most favorable to the nonmovant." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Applicable substantive law identifies those facts that are material. *Id.*  An issue is not genuine if it is

unsupported by evidence or created by evidence that is "merely colorable, or is not significantly probative." *Id.* at 249 (citations omitted).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can satisfy its burden of proving the absence of a genuine dispute by citing to particular materials in the record or by showing the nonmovant cannot produce evidence to establish an element essential to their case to which it has the burden of proof. Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 322–23. If the movant meets this burden, the burden shifts to the nonmoving party to establish "specific facts showing that there is a genuine issue for trial" with evidence beyond the pleadings. *Celotex Corp.*, 477 U.S. at 324. Generally, a "mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## BACKGROUND

The facts, stated in the light most favorable to Brown-Edwards, are as follows:

### A. Tracey Brown-Edwards

Brown-Edwards began her employment with the Office of the Attorney General (OAG) in 1998 as a clerk in the Consumer Affairs Division. (Doc. 101-25 at 10.) She was subsequently appointed as a Public Protection Specialist in 1999

and then as an unclassified, non-merit[1] A.G. Special Investigator in 2005.  (Doc. 101-25 at 10.)  In 2008, the OAG appointed Brown-Edwards to the merit system position of Special Agent in the Medicaid Fraud Control Unit (MFCU).  (Doc. 101-1 at 14.)  As a Special Agent in the MFCU, Brown-Edwards was responsible for investigating Medicaid provider fraud and the abuse, neglect, and exploitation of Medicaid patients.  (*See* Doc. 101-25 at 43–44.)  Brown-Edwards was supervised by Gerald Shockley, a Senior Special Agent within the MFCU, until January 2019, when his supervisory duties were removed and taken over by Bruce Lieberman, Division Director of the MFCU.  (Doc. 110-9 at 9, 45.)  Lieberman served as Brown-Edwards's supervisor until she was terminated in February 2022.

In October 2013, Brown-Edwards applied for a position as a Senior Special Agent, a merit system position.  (Doc. 101-25 at 10–11.)  Promotion to a new merit-classified position within the OAG, such as a Senior Special Agent position, requires an employee to (1) turn in an application, (2) meet the minimum qualifications, (3) complete and pass any test necessary for the classification, (4) score high enough to appear in the top ten applicants on the employment or promotional register ("Certificate of Eligibles" or "COE"), and (5) be considered and selected from the COE.  (*See* Doc. 101-25 at 6–9.)  When seeking to fill a vacant merit position, the

---

[1] Unclassified or non-merit positions are not afforded the due process protections that classified or merit positions are afforded.  (*See* Doc. 101-4 at 3.)  As such, an employee who works in an unclassified or non-merit position can be terminated at will for no reason while a merit employee cannot.

4

OAG must request a COE from the State Personnel Department in the classification, option, and location for the vacant position it is seeking to fill.  (Doc. 101-25 at 9.) The OAG cannot appoint a person to a merit position unless they appear on the COE. (Doc. 101-25 at 9.)

Brown-Edwards has appeared on every COE requested by the OAG from March 2014 through April 2021 to fill an open Senior Special Agent position, but she has not been selected for promotion. (*See* Doc. 101-25 at 11.)

## B. Alleged Incidents of Discrimination

Brown-Edwards filed her first EEOC charge in July 2017, alleging she experienced unlawful race and gender discrimination at the OAG.  (Doc. 101-12.) The EEOC issued Brown-Edwards a right to sue letter on February 12, 2018, but she did not file suit. (Doc. 1 at 2.)

In May 2019, Brown-Edwards filed her second charge with the EEOC, alleging race and gender discrimination in violation of Title VII and the EPA.  (Doc. 35-1.)  The EEOC issued a right to sue letter on July 31, 2020.  (Doc. 1 at 4.)  This time, Brown-Edwards filed a lawsuit, the instant one.  In the governing Complaint, Brown-Edwards asserts the following counts:

Count I – Title VII – Race-Based Employment Discrimination
Count II – Title VII – Gender-Based Employment Discrimination
Count III – Title VII – Race-Based Pay Discrimination
Count IV – Equal Pay Act – Gender-Based Pay Discrimination
Count V – Discriminatory Adverse Employment Action – Retaliation/Reprisal
Count VI – Past and Continuing Harassment-Hostile Work Environment

Brown-Edwards bases this lawsuit on the following employment-related events and claims:[2]

## 1. Uneven Case Assignments

Brown-Edwards claims she and her colleagues were given uneven case assignments within the MFCU. MFCU cases generally fall within four categories: Provider Fraud; Drug Diversion; Abuse/Neglect; and Fraud within Medicaid. (Doc. 110-9 at 3.) According to Brown-Edwards, Provider Fraud cases are the most sought-after assignments (Doc. 112 at 13), and according to administrative assistant Patricia Davis, Shockley assigned more Provider Fraud cases to white male agents while assigning Brown-Edwards less-desirable cases (Doc. 101-22 at 4–5). Brown-Edwards also claims Shockley provided white male agents the opportunity to accept or decline assignments, while she was not given the same opportunity. (Doc. 101-1 at 18; Doc. 101-19 at 6–7.)

## 2. December 2018 Performance Evaluation

All state agency employees are subject to annual performance evaluations that factor into their salary and ranking on the promotional register. (*See* Doc. 101-25 at 4, 6–7.) Employees are evaluated on a five-level categorical scale: Does Not Meet Standards; Partially Meets Standards; Meets Standards; Exceeds Standards; and

---

[2] In her Complaint, Brown-Edwards describes a myriad of alleged discriminatory actions. However, in her response to Marshall's summary judgment motion, she discusses only four of them. As such, the Court considers all other alleged discriminatory actions to be abandoned.

Consistently Exceeds Standards.  (Doc. 101-25 at 4.)   Merit system employees whose performance falls within the Exceeds Standards or Consistently Exceeds Standards categories are eligible for the maximum two-step merit pay increase, or approximately 5% of their salary.  (Doc. 101-25 at 4–5.)

Between 2009 and 2021, Brown-Edwards received evaluation scores that fell within the Exceeds Standards category, although her actual numeric score has differed year to year.  (*See* Doc. 110-1.)  As a result, Brown-Edwards received the maximum two-step merit pay increase every year she was employed in the MFCU, with the exception of the years the State of Alabama implemented a salary freeze applicable to all state employees.  (*See* Doc 110-1.)

On December 11, 2018, Brown-Edwards received a performance evaluation score of 30, which fell within the Exceeds Standards category.  (Doc. 110-1 at 109.) She then met with Clay Crenshaw, Chief Deputy Attorney General of Alabama, to complain about her performance evaluation and discriminatory treatment within the MFCU, particularly at the hands of Shockley.  (Doc. 101-14 at 18–19.)  Following this meeting, Brown-Edwards submitted a formal rebuttal to this evaluation, arguing she received a low score in retaliation for complaining of discriminatory behavior by Shockley and Lieberman, and that the white male agents within the MFCU received higher scores than her.  (Doc. 110-1 at 111.)

Brown-Edwards was subsequently notified that she received the maximum two-step merit pay increase based on her 2018 performance evaluation, bringing her salary to $69,396.  (Doc. 110-1 at 108.)

### 3. Shockley Driving Incidents

In February 2019—shortly after Crenshaw stripped Shockley of his supervisory responsibilities in a claimed reorganization—Lieberman instructed MFCU agents to assist with transporting individuals to a Medicaid 101 training program.  (Doc. 101-1 at 39; Doc. 110-8 at 18–19.)  On the morning of February 26, 2019, after having made multiple trips transporting trainees, Shockley instructed Brown-Edwards to transport another group of trainees to the OAG's offices.  (Doc. 101-1 at 39.)  Brown-Edwards refused this instruction, which upset Shockley.  (Doc. 101-1 at 39.)  Later that day, as she transported a group of trainees, Brown-Edwards claims Shockley was "tailgating [her] so hard that if [she] hit [her] breaks . . . [Shockley would] slam into [her]."  (Doc. 101-1 at 39.)  Shockley then passed Brown-Edwards and then cut her off, causing her to slam on her brakes.  (Doc. 101-1 at 39.)

Two days later on February 28, 2019, after a training session ended, Brown-Edwards parked her car behind the OAG offices to transport trainees.  (Doc. 101-1 at 40.)  As Brown-Edwards started to exit her car, she "saw Shockley coming off Decatur speeding coming around the counter like he's headed straight for [her]

door." (Doc. 101-1 at 40.)  Brown-Edwards pulled herself back in her car to avoid being hit and called another OAG employee to complain about Shockley's driving. (Doc. 101-1 at 40.)  Brown-Edwards reported these incidents to Crenshaw several days later.  (*See* Doc.110-15.)

### 4. Brown-Edwards's Comparator for Pay Discrimination

Brown-Edwards identifies James Lambert as a comparator for her pay discrimination claims.[3]  Prior to working with the OAG, Lambert served as a Supervisory Special Agent for the United States Department of Homeland Security and had state law enforcement experience.  (*See* Doc. 101-25 at 113–20.)  In February 2013, the OAG appointed Lambert as a Special Agent assigned to the Investigations Division, with an annual salary set at Step 1 of the Special Agent pay range, or $43,339.20 annually.  (Doc. 101-7 at 1.)  Brown-Edwards's salary at the same point in time was $50,119.20, or Step 7 of the Special Agent pay range.  (Doc. 110-1 at 1, 25.)

In July 2014, Lambert was promoted to a Senior Special Agent position and received a salary increase to $47,757.60 annually.  (Doc. 110-7 at 2.)  Brown-Edwards's salary at this time was $52,663.20, even though she remained a Special Agent.  (Doc. 110-1 at 30.)  Lambert was subsequently appointed to an unclassified

---

[3] In her Complaint, Brown-Edwards identified four comparators, but in her summary judgment briefing, she advances only one—Lambert.

A.G. Special Investigator position in February 2015 and then appointed to A.G. Chief Investigator in December 2016. (Doc. 101-25 at 15–16.)

## DISCUSSION

The Court will first address Brown-Edwards's Title VII claims for race and gender discrimination, retaliation, and hostile work environment, and then her pay discrimination claims under the EPA and Title VII.

### A. Title VII Discrimination, Retaliation, and Hostile Work Environment

Marshall presents numerous reasons for why each of Brown-Edwards's Title VII claims fail as a matter of law, but his overarching argument is that the events Brown-Edwards advances in her Complaint do not support actionable claims for discrimination, retaliation, or a hostile work environment under Title VII.

Title VII of the Civil Rights Act prohibits employers from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of race or gender. 42 U.S.C. § 2000e-2(a)(1). It is well settled that "Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020). "Trivial slights are not actionable," *id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), and thus it is the Court's role to determine whether the challenged conduct meets the requisite level of substantiality under Title VII.

### 1. Racial and Gender Discrimination (Counts I and II)

Since Title VII concerns "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a), courts have interpreted this language as requiring an adverse or tangible employment action to sustain a discriminatory treatment claim. *See, e.g., Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) ("A discrimination claim under Title VII requires an adverse employment action.").  "Tangible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Monaghan*, 955 F.3d at 860 (first citing *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); and then citing *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005)).

According to Marshall, a liberal and interpretative reading of Brown-Edwards's Complaint confines her discrimination claims to Shockley's case assignments[4] and his intentional lowering of her December 2018 evaluation score. Marshall argues that neither of these actions constitute an actionable adverse

---

[4] Brown-Edwards does not discuss the allegations regarding leave slips in her brief opposing Marshall's motion for summary judgment, and thus has abandoned any claim with respect to this alleged conduct. *See Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).

employment action for Brown-Edwards's discrimination claims to survive summary judgment.

In her response, Brown-Edwards primarily focuses on the case assignments issue. According to Brown-Edwards, Shockley consistently assigned more of the "high profile" Provider Fraud cases to white male agents. Brown-Edwards does not specifically articulate what adverse impact these case assignments had, but instead argues that the mere assignment of cases along racial or gender lines is unlawful under Title VII, (*see* Doc. 112 at 22 (citing *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 471–72 (11th Cir. 1999))), and that an employer may be liable for discriminatory assignments even absent evidence of economic harm (*see* Doc. 112 at 22–23 (citing *Swint v. Pullman-Standard*, 539 F.2d 77, 89–90 (5th Cir. 1976))). Thus, Brown-Edwards's argument appears to be that evidence of discriminatory intent alone is sufficient for her Title VII claim to survive summary judgment, irrespective of whether a distinct adverse employment action resulted. But the authorities she cites—*Ferrill* and *Swint*—do not support this proposition.

*First*, the Eleventh Circuit has clarified that *Ferrill* did not "eliminate the requirement that the employee show he or she suffered an adverse employment action" as it "does not even mention, let alone address, the adverse employment action element of a disparate treatment claim." *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 609 (11th Cir. 2008).

*Second*, the former Fifth Circuit's decision in *Swint* is distinguishable.  The underlying issue in *Swint* was whether the employer's seniority system perpetuated the effects of past discrimination.  *See* 539 F.2d at 90.  Since the plaintiff's prima facie case depended on the existence of past discrimination, the circuit court reasoned that "[g]oing further and requiring plaintiffs to prove that past assignment practices produced lower pay checks" was unnecessary as Title VII's prohibitions "are explicitly broader than economic harm."  *Id.* at 90.  While *Swint* may stand for the proposition that evidence of economic harm itself is not required to show adverse action, it did not eliminate a plaintiff's burden of showing she suffered some type of adverse action.  *See* 42 U.S.C. § 2000e-2(a)(1); *Monaghan,* 955 F.3d at 860 ("It has long been settled that Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality.").

Furthermore, the Eleventh Circuit has made clear that Title VII work assignment claims are generally disfavored.  *See Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1203–04 (11th Cir. 2013) (explaining "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise" and "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions" (quoting *Davis*, 245 F.3d at 1244, 1245)).  While the Eleventh Circuit has indeed recognized that there may be "unusual instances" where work assignment claims "may be so substantial and material" to constitute adverse

employment action, it emphasized that "[i]n the vast majority of instances . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection" of Title VII. *Davis*, 245 F.3d at 1245. This is precisely the allegation Brown-Edwards has made—that is, she was not assigned as many prestigious cases as her white-male counterparts. But Brown-Edwards has not shown that her case is one of the "unusual instances" where case assignments had any adverse impact on her employment or compensation. *See id*. Absent such evidence, her discrimination claim associated with her work assignments cannot survive summary judgment.

With respect to her performance evaluations, Brown-Edwards claims her evaluations impacted her promotability and pay because she was ranked sixth on the Senior Special Agent COE as of April 2021. As with her claims regarding case assignments, Brown-Edwards has not shown any adverse effect resulting from her performance evaluations, even if one assumes they were discriminatorily lowered and that the claim is timely.

*First*, Brown-Edwards has not shown how her performance evaluations have negatively impacted her compensation. While her individual scores have varied each year, Brown-Edwards consistently received an Exceeds Standards evaluation rating when Shockley served as her supervisor, beginning in 2009. (*See* Doc. 110-1; Doc. 101-25 at 17.) And as a result of her performance evaluations, Brown-

Edwards has received the maximum two-step merit pay raise every year, except for the years where the State of Alabama froze salary raises for all employees.  (Doc. 101-25 at 17.)

*Second*, Brown-Edwards has not shown that her performance evaluations suppressed her promotional opportunities.  When an agency must fill a position relying on candidates listed in the COE, it is not obligated to select the highest-ranked candidate.  Rather, it can choose from any of the ten candidates listed on the COE.  (Doc. 101-25 at 9.)  That Brown-Edwards was ranked sixth on the Senior Special Agent register in 2021[5] shows that her 2018 performance evaluation did not have an adverse impact as she would have been in a "reachable position" for promotional opportunities—that is, since she appeared on the COE of top ten eligible applicants for the position.  (*See* Doc. 101-25 at 9–11.)  And the record shows that Brown-Edwards has appeared in a reachable position on every Senior Special Agent certification requested between March 2014 and April 2021.  (Doc. 101-25 at 10–11.)  Furthermore, there is no evidence that individual rankings on the register factor into final hiring decisions; after all, Brown-Edwards herself was hired as a Special

---

[5] A hiring agency may request candidates from an open/competitive register, a promotional register, or both.  (Doc. 101-25 at 6.)  For the promotional register, the evaluation of the applicant's training and experience comprises 95% of the applicant's final score, with the remaining 5% being based on the average of the applicant's service ratings for the last three years.  (*Id.* at 9.)  Thus, 5% of Brown-Edwards's score on the promotional register in 2021 would include the average of her performance evaluations from 2020 and 2019, which were conducted by Lieberman, and 2018, which was conducted by Shockley.

Agent over individuals ranked higher than her.  (*See* Doc. 101-25 at 11.)  Thus, Brown-Edwards has not shown that she suffered an adverse employment action based on her performance evaluations.

Based on the forgoing, Marshall's summary judgment motion as to Brown-Edwards's race and gender discrimination claims under Title VII (Counts I and II) is due to be granted.

## 2. Retaliation (Count V)

In her Complaint, Brown-Edwards alleges she was subject to retaliation based on the following actions by Shockley: (1) her December 2018 performance review, and (2) two incidents in February 2019 where Shockley nearly hit Brown-Edwards with his car.  (*See* Doc. 1 at 7–11.)

Title VII makes it unlawful for employers to retaliate against employees that oppose unlawful discriminatory conduct.  *See* 42 U.S.C. § 2000e-3(a).  "To make a prima facie case for a claim of retaliation under Title VII, a plaintiff must first show (1) that 'she engaged in statutorily protected activity,' (2) that 'she suffered an adverse action,' and (3) 'that the adverse action was causally related to the protected activity.'"  *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (citation omitted).

Marshall argues Brown-Edwards's retaliation claim fails as a matter of law because she cannot provide evidence of an adverse employment action connected to

protected conduct.  Specifically, Marshall argues there is no evidence to support Brown-Edwards's claim that her December 2018 performance evaluation score was based on any protected conduct, and that the aggressive driving incidents involving Shockley do not evidence retaliation because, per Brown-Edwards's own assertion, Shockley's aggressive driving was in response to her refusal of his instruction to drive trainees to a training program, not for her engagement in any protected conduct under Title VII nearly two months earlier.

Brown-Edwards does not directly respond to Marshall's arguments in her brief opposing summary judgment, nor does she provide any argument for how Shockley's challenged conduct supports her retaliation claim.  Instead, Brown-Edwards merely provides the legal framework for retaliation claims and notes she engaged in protected activity on December 14, 2018 and in January 2019 when she met with Crenshaw to complain about discriminatory practices within the MFCU. To the extent Brown-Edwards discusses the events underlying her retaliation claim, she does not explain how her performance evaluation or Shockley's aggressive driving are related to her protected activity such that her retaliation claim should survive summary judgment.

"There is no burden upon a district court to distill every potential argument that could be made based upon the materials before it on summary judgment; the onus is on the parties to formulate arguments." *Hawthorne v. Sears Termite & Pest*

*Control, Inc.*, 309 F. Supp. 2d 1318, 1327 (M.D. Ala. 2003) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).   Absent any substantive argument from Brown-Edwards as to why her retaliation claim should survive summary judgment, the Court agrees with Marshall that her claim fails as a matter of law.

For instance, the record shows that Shockley conducted Brown-Edwards's 2018 performance evaluation on December 11, 2018, three days *before* Brown-Edwards claims she met with Crenshaw on December 14, 2018.  Thus, her December 2018 performance evaluation could not have been in retaliation for this protected conduct.  And with respect to Shockley's aggressive driving in February 2019, there is evidence to support Marshall's argument that his conduct was caused by Brown-Edwards's refusal of his instruction to drive trainees rather than her protected conduct.  In fact, Brown-Edwards admittedly attempts to make that connection in her Complaint.  And finally, Brown-Edwards does not point to any evidence that Shockley knew of her protected conduct when these driving incidents allegedly occurred.  *See Brungart v. BellSouth Telecomms., Inc*., 231 F.3d 791, 799 (11th Cir. 2000) ("In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.").

For these reasons, summary judgment is due to be granted in Marshall's favor on Brown-Edwards's retaliation claim (Count V).

### 3. Hostile Work Environment (Count VI)

In Count VI, Brown-Edwards brings a hostile work environment claim. An employee has an actionable Title VII claim based on conduct that creates a "discriminatorily hostile or abusive environment," even if such conduct falls short of a tangible adverse action. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). That is, Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (internal citation omitted); *see also Monaghan*, 955 F.3d at 861.

To evaluate whether discriminatory conduct rises to the level of a hostile work environment, courts consider its "frequency . . .; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (quoting *Harris*, 510 U.S. at 23). Additionally, a plaintiff must show "that the environment was both subjectively and objectively hostile." *Id.*

Marshall argues that Brown-Edwards cannot succeed on her hostile work environment claim because she cannot establish any severe or pervasive conduct occurring within the relevant statute of limitations.  In her opposition to summary judgment, Brown-Edwards recounts every harassing and hostile incident she has experienced since 2011, including two racially offensive comments made by Lieberman in 2011 and 2013; her denial of a promotion in 2014; and Shockley's more recent alleged discriminatory work assignments, performance evaluations, and intimidating behavior.  (*See* Doc. 112 at 25.)  Brown-Edwards also cites *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), seemingly to argue that her hostile work environment claim is timely based on all the allegedly adverse events she has experienced over the years.

In *National Railroad Passenger Corp.*, the Supreme Court held a plaintiff cannot recover for "discrete acts of discrimination or retaliation" that are time-barred, but that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, *so long as an act contributing to that hostile environment takes place within the statutory time period*."  536 U.S. at 105 (emphasis added); *see also Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) ("Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim,

it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim."). Accordingly, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Morgan,* 536 U.S. at 120. Put differently, "[t]he pivotal question is whether the timely discrete acts are sufficiently related to the hostile work environment claim." *Chambless*, 481 F.3d at 1350. To answer this question, the Court must determine whether the discrete acts that occurred after December 2018 "were the same type of 'discriminatory intimidation, ridicule, and insult' that characterized the untimely allegations." *See id.* (citation omitted).

None of the timely discrete acts Brown-Edwards challenges in her Complaint pass this test. The only discernible discriminatory conduct Brown-Edwards identifies in her opposition to summary judgment are two racially offensive statements made by Lieberman in 2011 and 2013. Brown-Edwards has not identified any similar conduct that has occurred since December 2018, nor has she shown how the timely challenged conduct—the performance evaluation, case assignments, and threatening driving behavior—were of the same type of offensive behavior that characterize the untimely allegations.

Brown-Edwards also has not shown that the timely challenged actions meet the necessary standard for establishing a hostile work environment claim. No

reasonable person could conclude that a performance evaluation sufficiently high enough to qualify for the maximum merit-based salary raise, even if lower than one believed was deserved, constitutes harassment.  Likewise, Brown-Edwards has not shown how being assigned less-prestigious case assignments unreasonably interfered with her job performance.  In fact, it appears to demonstrate the opposite when she argues that she received Exceeds Standards evaluation scores regardless of whether she was assigned any Provider Fraud cases.  (*See* Doc. 112 at 15.) Brown-Edwards's dissatisfaction with the prestige of her case assignments does not constitute the type of harassment that would support a hostile work environment claim.  *See, e.g., Davis v. U.S. Postmaster Gen.*, 190 F. App'x 874, 877 (11th Cir. 2006) (per curiam) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)) (holding that an employee's allegations, which included changing his job responsibilities and giving him difficult work assignments, did not meet the standard for establishing a hostile work environment even if true); *Alexander v. Opelika City Bd. of Educ.*, No. 3:06-CV-0498-WKW, 2008 WL 401353, at *5 (M.D. Ala. Feb. 12, 2008) (same); *see also Dickerson v. U.S. Dep't of Veterans Affs.*, 804 F. Supp. 2d 1279, 1291 (M.D. Ga. 2011) (finding challenged dangerous work assignments were not instances of "intimidation, ridicule, or insult" to constitute a hostile environment).  Finally, Brown-Edwards does not provide any evidence or even argue that Shockley's aggressive driving incidents in February 2019 were

motivated by anything other than retaliation for her previous complaints about his behavior and her refusal to abide by his instruction to transport trainees. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007) (explaining Title VII does not prohibit harassment alone, but only harassment "that discriminates based on a protected category").

For all these reasons, Marshall's motion for summary judgment as to Brown-Edwards's hostile work environment claim (Count VI) is due to be granted.

## B. Pay Discrimination Claims under Title VII and the EPA

Brown-Edwards also claims she was subjected to unlawful pay discrimination in violation of Title VII and the EPA, alleging she earned less than her white male comparators. Regardless of the framework used to analyze her claims, Marshall argues Brown-Edwards cannot establish a prima facie case for pay discrimination because she cannot identify a proper comparator nor provide evidence of discriminatory intent.

Brown-Edwards does not directly address these arguments in her opposition brief. Instead, Brown-Edwards vaguely claims she can succeed on her discrimination claims under a mixed-motive analysis or a convincing mosaic theory, and she further argues that her EPA claims are timely under the "continuing violation" doctrine. (Doc. 112 at 20–22, 27–28.) In his reply brief, Marshall argues Brown-Edwards has waived her pay discrimination claims because she failed to

directly respond to his arguments for summary judgment. (Doc. 121 at 8.) The Court will assume without deciding that she has not abandoned these claims and instead will analyze whether she has presented evidence sufficient to survive summary judgment.

### 1. Pay Discrimination Under the EPA (Count IV)

The EPA prohibits employers from discriminating on the basis of sex by paying employees of different sexes different rates for the same work. 29 U.S.C. § 206(d)(1). To establish a prima facie case of discrimination under this statute, a plaintiff must show that her employer "pays different wages to employees of opposite sexes 'for equal work on jobs'" the performance of which requires "equal skill, effort, and responsibility, and which are performed under similar working conditions." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting in turn 29 U.S.C. § 206(d)(1))). The initial burden to demonstrate comparability is "fairly strict"; although the jobs compared need not be identical, a plaintiff must demonstrate "that she performed substantially similar work for less pay." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992); *see also Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989) ("The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high."). The primary focus is on the duties of each job, not on the individual

employees holding those jobs.  *See Miranda*, 975 F.2d at 1533 (noting that "the controlling factor under the Equal Pay Act is job content" (citation omitted)).

Brown-Edwards bases her EPA claim on the differences between her and Lambert's salaries when he was promoted to a Senior Special Agent position in July 2014.  This claim is flawed for two reasons.  *First*, she has not shown—and cannot show—that she and Lambert performed substantially similar work as their positions had different job titles, different job responsibilities, and were in different divisions of the OAG: she a Special Agent in the MFCU investigating Medicaid-related claims, and Lambert a Senior Special Agent in the Investigations Division.  Thus, Brown-Edwards has not established a prima facie case for pay discrimination under the EPA.

*Second*, and most importantly, Brown-Edwards cannot use the continuing violation doctrine to challenge a pay discrepancy that existed between her and Lambert due to the OAG's failure to promote her to a Senior Special Agent position in 2014 in lieu of Lambert.  An employer's failure to promote and discriminatory pay practices are discrete actions that must be challenged and asserted separately. *See Morgan*, 536 U.S. at 114.  Since Brown-Edwards did not challenge this hiring decision within the applicable statute of limitations, any claim with respect to the OAG's failure to promote her in 2014 is time-barred.  *See Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they

are related to acts alleged in timely filed charges.").  And the continuing violation theory does not render her failure-to-promote challenge timely merely because she was paid less than Lambert as a consequence of being passed over for the promotion in 2014.  *See Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993) (the Eleventh Circuit distinguishes between "the present consequence of a one time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does" (citation omitted)).  Nor does the continuing violations doctrine apply where the plaintiff fails to establish an initial discriminatory pay violation. *See id.* at 448–49.  Simply put, Brown-Edwards cannot disguise an untimely failure-to-promote claim as a pay discrimination claim merely because she was paid less than she would have made had she been promoted.

For these reasons, Marshall's summary judgment motion as to Brown-Edwards's pay discrimination claim under the EPA (Count IV) is due to be granted.

### 2. Pay Discrimination Under Title VII (Count III)

Title VII likewise prohibits discriminatory pay practices based on protected characteristics.  Typically, Title VII pay discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework, which requires the plaintiff to show, among other things, that "she and her proffered comparators were 'similarly situated in all material respects.'"  *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir 2019) (*Lewis I*).  A similarly situated comparator will ordinarily (1)

have engaged in the same basic conduct as the plaintiff; (2) will have been subject to the same employment policy or guidelines; (3) will have been working under the same supervisor; and (4) will share the plaintiff's employment or disciplinary history. *Id*. at 1227–28. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis I*, 918 F.3d at 1224–25.

Brown-Edwards advances no argument that she and Lambert were similarly situated to establish a prima facie case for pay discrimination under the *McDonnell Douglas* framework, nor does the record support such a finding, and therefore her claim goes no further under *McDonnell Douglas*. But "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "Even without similarly situated comparators, 'the plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Id.* (quoting *Smith*, 644 F.3d at 1328).

Brown-Edwards argues she has provided circumstantial evidence sufficient to survive summary judgment under either a mixed-motive theory or convincing mosaic theory of discrimination. The Court disagrees. Viewing the record in a light most-favorable to Brown-Edwards, there is simply no evidence from which a reasonable jury could infer that discriminatory animus played any role in any decision relating to her pay, especially for a timely asserted pay claim. As previously noted, the only discernible discriminatory conduct Brown-Edwards identifies are two racially offensive statements made by Lieberman in 2011 and 2013. But there is nothing connecting these comments—made years after her initial salary was set— to any decision involving her pay, especially when considering that her position is subject to a defined pay scale (*see* Doc. 101-25 at 3), and that the OAG "requested, and obtained, approval . . . to set her salary [when hired as a Special Agent] above the minimum," (Doc. 101-25 at 10). And as the Court has already observed, Brown-Edwards received the maximum two-step merit pay raise every year such raises were available. There is simply no evidence indicating that her supervisors "were influenced by [illegal] bias," "took sex [or race] into account when considering personnel matters," or that her supervisors "repeatedly exhibited an unwillingness to treat [Black] women equally in the workplace" for her pay discrimination claim to survive summary judgment. *Cf. Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362–63 (11th Cir. 2018).

28

As such, Marshall's motion for summary judgment as to Brown-Edwards's pay discrimination claim under Title VII (Count III) is due to be granted.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the Motion for Summary Judgment (Doc. 100) is **GRANTED**.

DONE, this 6th day of January, 2023.


            R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE